1. It does not appear that there has been any actual possession in the lessor of the plaintiff, or the persons under whom he claims, since 1728; therefore, if the plaintiff ever had a right to recover in an action of ejectment, that right has been lost by his laches.
(6) The nature of the title to lands is such as to make it divisible into three distinct species of property or kinds of right. It may consist of the naked possession or a right of possession, or a mere rightof property. The first may happen where a person in this country should enter upon a woodland, though granted estate, and settle and cultivate it, and thus actually occupy, without the shadow of right or color of title, as it is called in our courts. The second will take place where the patentee submits to the unsanctioned occupation of the settler, who has the actual possession, while the right of possession resides in the person to whom the land was granted. The third species of property will be found where the grantee may have "the true ultimate property of the lands in himself, but by the intervention of certain circumstances, either by his own negligence, the solemn act of his ancestor, or *Page 23 
the determination of a court of justice, the presumptive evidence of that right is strongly in favor of his antagonist, who has thereby obtained an absolute right of possession." 2 Bl. Com., 195, 196, 197; Co. Lit., 345, 385; Gilb. Ten., 18.
Ejectment being a possessory action, it lies only where the lessor of the plaintiff could rightfully enter, and the title to support a recovery must therefore be inseparably connected with the right of possession, and must have this ingredient at least. The title of the defendant is entirely out of view. It is an old maxim that a man must recover by the strength of his own title in ejectment, not in consequence of any weakness in that of his adversary. Every plaintiff in ejectment, says Lord Mansfield, in Atkinsv. Horde, must show a right of possession, as well as a right of property; therefore, the defendant need not plead the statute, and the plaintiff must show that his lessor had a right to enter; and this can only be effected by proving a possession within seven years in the plaintiff, his ancestors, or the persons under whom he claims, and such possession must be an actual possession. 1 Burr., 119; Runn., 112, 113.
By the statute of 21 Jac. I., ch. 16, "None shall make an entry into land but within twenty years after their right or title shall first descend or accrue." Our own act of limitations only alters the phraseology to "shall thereunto enter or make claim," and shortens the limitation to seven years; so that the English decisions may be considered authorities as to the operation of this part of the statute; and it will appear by all these, as well as the opinions of every writer on the subject, that where there hath been no possession during the time limited in (7) the statute, either in the lessor, his ancestors, or the persons under whom he claims, the plaintiff in this action will be nonsuited, unless his case may be brought within some of the exceptions allowed by the act of Assembly. The action of ejectment is only competent where the plaintiff may enter; and the right of entry is, in this case, completely taken away by the statute, and the claimant, by such default, utterly excluded and disabled from any entry, or claim to be made, after the seven years are expired. This is not only the plain letter of the law, but the construction has been uniform. Runn., 14 to 17; Salk., 205; 5 Bur., 2635; 6 Mod., 44; Cas. K. B., 573; 2 Keble, 127; 1 Bur., 119.
Thus the neglect of the plaintiff, in this case, to enter, or make claim, as I take it, has wrought an actual bar; not by the defendant acquiring title, but by his losing or destroying his own right of action; and to the authorities already adduced may be added the case in Strange, 1142, and the law as stated in 2 Bl. Com., 196, 197, 198. The law presumes that the tenant in possession either had at first a good title, in consequence of which he entered on the lands in question, or that since his entry he *Page 24 
had acquired one; and, therefore, after so long an acquiescence his possession shall not be disturbed without inquiring into the absolute and real right of the property, unconnected with the right of possession.
He said that the legal notions of possession in this country have been extremely vague and indefinite, but he did not recollect any case in which this doctrine had been settled with due precision. The constructive possession, mentioned in some cases by our judges, is a doctrine unknown to the common law; but he held that the correct idea of that possession, which would arrest the operation of this act, is such a possession as is described by Coke Inst., 15. Quasi pedis positio. That the claim must be made by suit in law under the express terms of the second section of the act, and that the entry must be an actual entry, and the possession an actual possession. Bul., 102, 103; I Salk., 285.
Independent of the operation of the second section of our act of limitation, by the determinations in England, received as authority here, seven years adverse possession is not only a negative bar to the action, or remedy of the plaintiff, but a positive title to the defendant; and, therefore, where A. had the possession of lands for twenty years in England, without interruption, and then B. got into possession, on which A. was put to his ejectment here, though A. was plaintiff, yet his (8) possession for twenty years was deemed a good title, and he recovered accordingly. This was ruled by Holt, C. J., saying that a possession for twenty years was like a descent, which tolls an entry, and gives a right of possession, which is sufficient to maintain an ejectment. Salk., 421.
In the present case there has been an actual uninterrupted and adverse possession for thirty-six years by the defendant and those under whom he claims, whereby he has acquired a title, upon the strength of which he could recover in this form of action against the plaintiff himself, who has now nothing left but the mere right of property.
The Court will also please to observe that this objection, under the form of the title acquired by the defendant from possession, collects additional force from a comparison of the statute of James with the act of North Carolina. The third section of our acts is an abstract from the first section of the English statute, and operates on the right or title of the person who is out of possession, without appearing to touch in any manner whatsoever the right or title of the tenant in possession.
The second section of our law enacts, "That all possessions of or titles to any lands, tenements, or hereditaments whatever, derived from any sales made either by creditors, executors or administrators of any persons deceased, or by husbands and their wives, or husbands in right of their wives, or by endorsement of patents, or otherwise, of which the *Page 25 
purchaser or possessor, or any one claiming under them, have continued or shall continue in possession of the same for the space of seven years, without any suit in law, be and are hereby ratified, confirmed, and declared good and legal, to all intents and purposes whatsoever, against all and all manner of persons; any former or other title or claim, act, law, usage or statute to the contrary in any wise, notwithstanding." In the whole of the statute of James there is nothing like this section, yet the adjudications in this country have always followed the construction of that statute, and have generally fallen short of them, without noticing the extensive and beneficial operation of this clause.
It will be remarked that this clause relates only to the right of the tenant in possession, operating in such a manner as to ripen an inchoate or defective right into a complete title; that the act embraces "all possessions of lands," as well as "title to lands," derived from any sales made to creditors, etc., or by indorsement of the patents, (9) or otherwise. Thus every "sale," whether of the possession, or right of occupancy, or the title, comes within the purview of this clause, which goes to the absolute confirmation of the title of the purchaser.
The act appears to have embraced expressly both the cases of a mereright of occupancy, and what is usually called a title, by the expressions of "all possessions of" or "titles to" "which the purchaser or possessor." So that sales of the right of occupancy, a very common case in this country ever since its first settlement, are clearly within the letter and policy of the act. The sale and assignment of the possession by the heir of Hopkins, connected with a continued possession, a possession that has not been interrupted by any suit at law, we contend has now ripened into a complete title, absolutely ratified and confirmed by this act to the defendant, any former or other titles notwithstanding.
It is not necessary to inquire in this case whether the defendant has acquired a title under the second section of this act that would resist a writ of right. The Court, however, would permit him to observe that if this act contained no more than the statute of James, there could have been no question as to this point; but our law has a much higher regard from possession, and connecting it with the circumstances of time makes it the strongest evidence of title; and it is from the full and strong expressions of this clause of the act that he had held a title like this could not be disturbed by a writ of right in this country.
The statute of limitations, as far as it respects real estates, is a law of the utmost importance to the peace and happiness of the community. The leading motive of entering into society was the protection of property, and the great object of the law is to secure and quiet men in the possession of it. This policy is strongly expressed in the preamble of the act: "Whereas great suit, debate, and controversy hath heretofore *Page 26 
been, and may hereafter arise, by means of ancient titles to land derived from patents granted by the Governor of Virginia, the conditions of which patents have not been performed, nor the quit-rents paid, of the lands have been deserted by the first patentees, or for or by reason or means of former entries or patents granted in this Government; for prevention whereof, and for quieting men's estates, and for avoiding suits in law, be it enacted," etc.
The case under the consideration of the Court is precisely one of the cases contemplated by the act. Where patentees have deserted their lands, still a wilderness, and others, ignorant of such appropriation, (10) have settled upon them and improved them by the labor of many years, expecting to acquire a title in the course of time, on the usual terms from Lord Granville or the King, it would be incompatible with the principles of justice, or the policy of an infant government struggling with the difficulties of settlement and a feeble population, to turn the improving tenant out of possession.
He said he relied with confidence upon these objections arising out of the statute, supported by an uniform train of decisions, and no determination in this country could be said to have shaken these authorities, unless the case of Mallett v. Mims in this Court should be considered as militating in some measure against the construction contended for on the first point. In that case two points were determined: (1) That the delivery of the grant to grantee should raise a constructive possession, sufficient in law to preserve the grantee's right of entry where there is not an adverse possession. (2) That the plaintiff shall be put to prove an actual possession in himself within seven years only where the defendant sets up an adverse possession for that time. In this case there has been an actual adverse possession ever since 1751, and for more than seven years by the defendant himself; so that this new doctrine of constructive possession, which owes its birth to this case of Mallett v.Minns, will not serve the plaintiff in this instance.
It may perhaps be said that the absence of Burrington beyond sea, as well as that of the lessor of the plaintiff, and the time struck out on account of the intervention of the war, will bring this case within the exception of the act of Assembly.
To this he answered that the proviso of the act of Assembly saves the right of action to persons beyond seas only for eight years after their title shall accrue, the words of the act being, "or persons beyond seas, within eight years after the title or claim becomes due, shall take benefit and sue for the same." So that it becomes necessary to bring suit within eight years after the adverse possession took place, even upon the doctrine delivered in the case of Mallett v. Mims. It is also to be observed that Mr. Strudwick came to this country in the year ______, *Page 27 
after the sale of Burrington to him, and that the act certainly attached upon his right at that time, and his returning to England would not prevent the statute running; so that after striking out the ten years from March, '73 to '83, there is sufficient time for the (11) statute to have complete effect; and when the act begins to run it cannot be suspended on account of any after defect or impediment whatsoever. To prove this point, he cited Plowd., 368 to 376, saying that indeed this was the case of a fine, but that the reason and principle was the same in a common case under this act; and that the determination upon the statute of limitations had ever since followed the decision in Stowellv. Lord Zouch. See. 2 Will., 582-3; 1 Will., 134; Stra., 556.
There is one other point of great importance which has not yet been sanctioned in this country by any direct decision. He said: I admit the doctrine has been questioned, but there is no part of the common law more clearly settled than that, when a descent is cast, the heir of the disseizor has the jus possessionis, because the disseizee cannot enter upon his possession and evict him, but is put to his real action, because the freehold is cast by the law upon the heir. Howell was thirteen years in possession, died in actual possession, and the law cast the freehold upon his son; and the reason of the law as stated in 2 Bl. Com., 177, applies to this country as strongly as any other. The law, says he, will presume that the possession which is transmitted from the ancestor to the heir is a rightful possession, until the contrary be judicially shown; and, therefore, the heir shall not be evicted by a mere entry, although such a measure would have been competent in law to have dispossessed the ancestor. The alteration by the statute of 32 Henry VIII. of this common-law rule only requires that the disseizor should have five years peaceable possession next after the disseizin, and a descent cast under these circumstances tolls an entry, unless the disseizee should have made continual claim. He therefore concluded that there being a descent cast in this case, the right of entry of the lessor was also thereby taken away, and that, therefore, the plaintiff could not recover in this action, and relied, as to this point, upon Inst., 250, 225, sec. 426; Gilb. Ten. from 21 to 36.
Mr. Moore, in reply, cited Burr., 60, to show the doctrine of seizin and disseizin, and to prove there could be no disseizin in this country.
after advising together on the bench for some time, said that the juspossessionis was lost by the plaintiff; and without giving their opinions at large, directed the plaintiff to be called; and accordingly he was called and nonsuited.
Cited: Tyson v. Harrington, 41 N.C. 335. *Page 28 
(12)